_____

No. 96-2606

_____

United States of America,           *
                                     *
        Plaintiff,                   *
                                     *
        v.                           *
                                     *
James B. McDougal; Jim Guy           *
Tucker; Susan H. McDougal;           *
                                     *
        Defendants.                  *
                                     *
Reporters Committee for              *
Freedom of the Press;                *
Radio-Television News Directors      *
Association; Capitol Cities/         *
American Broadcasting Companies;*
Cable News Network, Inc.;            *
National Broadcasting Company,       *
Inc.; CBS, Inc.;                     * Appeals from the United States
                                     * District Court for the
        Movants-Appellants,          * Eastern District of Arkansas
                                     *
        v.                           *     [TO BE PUBLISHED]
                                     *
Dow Jones and Company, Inc.;         *
                                     *
        Movant,                      *
                                     *
William Jefferson Clinton,           *
The President of the United          *
States in his official               *
capacity,                            *
                                     *
        Interested Party-Appellee.   *


_____

No. 96-2671

_____

United States of America,           *
                                     *
        Plaintiff,                   *
                                     *
        v.                           *

James B. McDougal; Jim Guy      *
Tucker; Susan H. McDougal;      *
                                *
    Defendants.                 *
                                *
Reporters Committee for Freedom *
of the Press; Radio-Television  *
News Directors Association;     *
Capitol Cities/American Broad-  *
casting Companies; Cable News   *
Network, Inc.; National Broad-  *
casting Company, Inc.;          *
CBS, Inc.;                      *
                                *
    Movants,                    *
                                *
    v.                          *
                                *
Dow Jones and Company, Inc.;    *
                                *
    Movant,                     *
                                *
William Jefferson Clinton,      *
The President of the United     *
States in his official          *
capacity,                       *
                                *
    Interested Party-Appellee.  *
                                *
Citizens United,                *
                                *
    Interested Party-Appellant. *

————————————

Submitted:  August 12, 1996

Filed:  December 20, 1996
————————————

Before McMILLIAN, FLOYD R. GIBSON and MAGILL, Circuit Judges.
————————————


McMILLIAN, Circuit Judge.


    A group of media organizations, including Reporters Committee
for  Freedom  of  the  Press;  Radio-Television  New  Directors
Association; Capital Cities/American Broadcasting Companies, Inc.;

-2-

Cable News Network, Inc.; National Broadcasting Company, Inc.; and CBS Inc. (hereinafter the Reporters), and a non-profit citizens' group, Citizens United (Citizens) (collectively appellants), each appeal from a final order entered in the United States District Court[1] for the Eastern District of Arkansas denying their applications for access to a videotape recording of President William Jefferson Clinton's deposition testimony used at trial in the underlying criminal case. United States v. McDougal, No. LR-CR-95-173 (E.D. Ark. June 11, 1996). For reversal, appellants argue that the district court's denial of physical access to the videotape, so that they may make copies, violated their First Amendment and common law rights of access to judicial records. Citizens alone additionally argues that the district court erred in holding that it lacked standing to participate in the litigation over this access issue. These appeals were consolidated for oral argument, which was expedited at the Reporters' request. Following oral argument on August 12, 1996, we entered an order which stated "[f]or reasons that will be stated in an opinion to follow, we affirm the district court's denial of access to the videotape."[2] United States v. McDougal, Nos. 96-2606/96-2671 (8th Cir. Aug. 12, 1996), amended, id. (Aug. 21, 1996) (amending caption to refer to Reporters Committee for Freedom of the Press, et al., as Movants-*Appellants*).[3] We now set forth our reasons for affirming the district court's order.

---

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

[2]At oral argument, counsel for the Reporters stated "I would respectfully ask this court today, after you have concluded your conference on this case, to issue an order immediately, today, with an opinion to follow, so that we can get on with this matter."

[3]Based upon our order of August 12, 1996, the Reporters filed a petition for rehearing by the panel and a suggestion for rehearing en banc. Both were denied. United States v. McDougal, No. 96-2606 (8th Cir. Oct 3, 1996) (order denying petition for rehearing by the panel and suggestion for rehearing en banc).

## Background

The following summary of the background is largely taken from the district court's order. Slip op. at 1-4. Prior to the trial in the underlying criminal case, the defendants requested that a witness subpoena be issued to President Clinton requiring him to appear and give testimony at their criminal trial. One of the defendants further moved to compel President Clinton to testify in person. In response, President Clinton sought the district court's permission to testify by videotaped deposition pursuant to Fed. R. Crim. P. 15.[4] The district court ordered that the witness subpoena be issued, but granted the President's Rule 15 request.

On April 24, 1996, the district court ordered that the videotape of President Clinton's deposition be kept under seal and gave the parties and the President thirty days in which to file briefs regarding the handling of the videotape following its use at trial. The district court also invited any representatives of the news media to file briefs in their capacity as amicus curiae within the same thirty-day deadline.

The President's videotaped deposition was taken at the White House on April 28, 1996, and the district court judge presided from Little Rock via satellite. On May 3, 1996, the Reporters filed an amicus brief requesting that they be given physical access to the

_____

[4]Rule 15 provides in pertinent part:

> Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place.

-4-

videotape immediately or, in the alternative, at the time of its display to the jury. None of the parties to the underlying criminal prosecution filed briefs concerning the access issue. On May 6, 1996, the district court entered an order in which the court stated that it would provide public access to the transcript of President Clinton's deposition after the presentation of the videotaped deposition testimony to the jury. The district court further indicated that access to the videotape would not be addressed until after May 24, 1996, the briefing deadline. The Reporters moved for reconsideration of the district court's denial of their request for immediate access to the videotape; on May 8, 1996, the district court denied the Reporters' motion.

In the meantime, counsel for the prosecution and counsel for the defendants had reviewed a draft of the entire written transcript of President Clinton's deposition and agreed to delete certain portions that generally contained objections and arguments of counsel. The transcript and the videotape were edited accordingly. The edited videotape was played for the jury on May 9, 1996. At that time, the courtroom was open to the public and filled to capacity. The public, including appellants, had an opportunity to view the edited videotape at the time and in the manner it was played to the jury in the courtroom.[5] The edited transcript was admitted into evidence and made a part of the record, and copies of the edited transcript were released to the public.

In addition to the Reporters' request for access to the videotape, Citizens filed an application for access to the videotape and Dow Jones & Co. (Dow Jones) requested a copy of the unedited transcript and access to the unedited videotape of

---

[5]At oral argument, counsel for Citizens stated that the district court had indicated its willingness to schedule a showing of the videotape for members of the public who were unable to view the videotape at the trial.

President Clinton's testimony.[6]  The President filed a motion for a protective order requesting that the original videotape and all copies thereof, whether edited or unedited, remain under seal.

Upon consideration of the outstanding motions and applications before it related to the videotapes and transcripts of President Clinton's deposition testimony, the district court granted Dow Jones's request for the unedited transcript but denied all requests for access to the videotape.  Slip op. at 10.  In denying access to the videotape, the district court relied upon Nixon v. Warner Communications, Inc., 435 U.S. 589, 608 (1978) (where White House audiotapes had been played for the jury and the public, including the press, during the Watergate trial and transcripts had been furnished to the press, the Court of Appeals erred in reversing the district court's denial of the press's request for access to the audiotapes because (1) the common law right of public access to judicial records did not authorize the release of the tapes in question from the district court and (2) the press did not have a right of access to the audiotapes under the First or Sixth Amendments),[7] and United States v. Webbe, 791 F.2d 103 (8th Cir. 1986) (where audiotapes created pursuant to the federal wiretap statute had been played for the jury and the public, including the press, in a criminal mail fraud trial and transcripts had been furnished to the press, the district court did not abuse its discretion, under a First Amendment or a common law analysis, in denying the press access to the audiotapes).  In the present case, the district court held that the press's First Amendment right of

---

[6]Dow Jones is not a party to the present appeals.

[7]In Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978), the district court declined to release for copying President Nixon's White House audiotapes, which had been admitted into evidence in the Watergate trial.  The Court of Appeals for the D.C. Circuit reversed the district court's denial of access, and the Supreme Court reversed the D.C. Circuit, thereby upholding the district court's original ruling.

access to public information had been "fully satisfied in this instance by allowing the press to attend the playing of the videotaped deposition and in providing full access to the written transcript." Slip op. at 6. As to the common law right of public access, the district court concluded that "[t]he Court need not decide at this time whether the common law right of access applies to videotaped testimony because even assuming it does, the Court finds, on balancing all the relevant factors, that the press's request to copy the videotape must be denied." Id. at 7. The district court concluded that, on balance, the circumstances favored keeping the videotape under seal because: (1) substantial access to the information provided by the videotape had already been afforded; (2) release of the videotape would be inconsistent with the ban on cameras in the courtroom under Fed. R. Crim. P. 53[8]; (3) in other cases involving videotaped testimony of a sitting president, the tapes were not released; and (4) there exists a potential for misuse of the tape, a consideration specifically recognized in Nixon v. Warner Communications, Inc., 435 U.S. at 601 (noting President Nixon's argument that the audiotapes could be distorted through cutting, erasing, and splicing). Slip op. at 7-9. In a footnote, the district court separately held that Citizens lacked standing to appear in the action and accordingly denied its application for access to the videotape. Id. at 2 n.2. These appeals followed.

## Discussion

On appeal, appellants maintain that the district court's denial of access to the videotape violated their common law and First Amendment rights of access to judicial records. Thus, as a threshold matter, they argue that the videotape is a judicial

---

[8]Rule 53 provides "[t]he taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the court room shall not be permitted by the court."

record to which such rights attach, even though it is merely an electronic recording of a witness's testimony and was not itself admitted into evidence. Without citing any supporting authority, appellants argue that the videotape should be treated as a judicial record because "[t]he defendants should not be permitted to circumvent the common law and constitutional rights to access by marking only the transcript of the videotaped deposition." Brief for Appellants (Reporters) at 13.[9] They also argue that, "[e]ffectively, the videotape was introduced into evidence by being played in open court." Id. Appellants conclude that "[t]he videotape is like any other piece of evidence introduced or used in the courtroom. It becomes a judicial record subject to public review." Id.

Assuming that the videotape is a judicial record, appellants contend that the denial of access violated their common law and constitutional rights under this court's holding in In re Search Warrant for Secretarial Area Outside Office of Gunn, 855 F.2d 569 (8th Cir. 1988) (In re Search Warrant (Gunn)). In In re Search Warrant (Gunn), a newspaper had unsuccessfully asked the district court to unseal documents that had been used to obtain a search warrant. This court considered the question of whether the documents in question were "judicial records" for purposes of the First Amendment analysis and opined that they were. Id. at 573. We nevertheless affirmed the district court's decision to keep the documents under seal on grounds that they contained sensitive information concerning an ongoing nationwide criminal investigation, and line-by-line redaction was not practicable. Id. at 574. In support of our disposition, we explained "[t]he first amendment right of public access is not absolute; it is a qualified right." Id. "[T]he documents may be sealed if the district court specifically finds that sealing is necessary to protect a

_____

[9]We address, primarily, the Reporters' arguments because they generally incorporate Citizens' arguments on the merits.

compelling government interest and that less restrictive alternatives are impracticable." Id. at 575. Because we determined that those requirements had been met, we affirmed the district court's order. Id.[10] Appellants argue, in the present case, that their common law and First Amendment rights were violated because nondisclosure was not necessary to protect a compelling government interest. Brief for Appellant (Reporters) at 5 (addressing common law right), 16 (addressing First Amendment right). On this point, appellants maintain that fear of misuse of the videotape in a political campaign does not constitute a compelling interest. They further assert, without citing authority, that "[t]he only government interest associated specifically with the Office of the President that might justify sealing a judicial record is national security." Id. at 23. The Reporters maintain that this court's holding in In re Search Warrant (Gunn) indicates that there is in this circuit "a strong presumption in favor of the common law right of access," Brief for Appellants (Reporters) at 4, notwithstanding our statement in Webbe, 791 F.2d at 106, that "[w]e decline to adopt in toto the reasoning of the Second, Third, Seventh, and District of Columbia Circuits in recognizing a 'strong presumption' in favor of the

_____

[10]Judge Bowman separately concurred, stating his opinion that it was unnecessary to reach the question of whether the documents at issue actually were "judicial records" for First Amendment public access analysis. In re Search Warrant for Secretarial Area Outside Office of Gunn, 855 F.2d 569, 575 (8th Cir. 1988) (In re Search Warrant (Gunn)). In any case, he reasoned, the public's interest in preserving the integrity of the ongoing investigation was "overwhelming" and necessarily overrode the public's interest in access. Id. at 576. He also indicated that his conclusion was based upon the "qualified" common law right of access. Id. ("[t]he common law right of access to judicial records--a qualified right with the decision as to access left to the sound discretion of the trial court--is well established"). Judge Bowman further stated "[t]his is all the more reason for leaving the first amendment question to another day and to a case that actually requires its resolution, which this case does not." Id. The third judge on the panel, Judge Heaney, dissented on the ground that the public's interest in access far outweighed the government's investigatory interests in that case. Id. at 576-77.

common law right of access." Citizens alone additionally argues that In re Search Warrant (Gunn) overruled Webbe and, if not, then this panel should take the opportunity to do so in the present case by holding that there is a strong presumption in this circuit in favor of public access to judicial records under the common law. Brief for Appellants (Citizens) at 19 n.4.

Appellants also challenge the district court's reliance on Nixon v. Warner Communications, Inc. and Webbe. They argue that Nixon v. Warner Communications, Inc. is not applicable to the present case because, in that case, the Presidential Recordings Act provided an alternative channel of access to the audiotapes in dispute.[11] In Webbe, they note, the press was denied access to wiretap audiotapes, which had been admitted into evidence, in part because there was a chance that the tapes would be used again as evidence in future trials related to other pending criminal charges. Appellants argue that no similar considerations exist in the present case,[12] and we should therefore instead follow United States v. Poindexter, 732 F. Supp. 170 (D.D.C. 1990). In Poindexter, the District Court for the District of Columbia denied a request by members of the press for physical access to a videotape of former President Reagan's deposition testimony *before* its use at trial. Id. at 172. However, the district court

---

[11]In the context of discussing the common law right of access, the Supreme Court noted sua sponte in Nixon v. Warner Communications, Inc., 435 U.S. at 603 & n.15, that, under the Presidential Recordings Act, a government archivist would be required to screen the Nixon White House audiotapes so that the tapes that were private in nature could be returned to the former president and those having historical interest could be made public.

[12]The defendants in the present case apparently did urge the district court not to release the videotapes on the ground that it would deny them a fair trial. Slip op. at 9 n.10. The district court acknowledged that one of the defendants was facing a second indictment, but nevertheless concluded that releasing the videotape would have little impact on that defendant's second trial and this factor did not weigh heavily against releasing the videotape. Id.

commented in a footnote that "[i]t is the Court's intention to provide such copies to the interested news media *after* the videotape is played at the trial itself." Id. at 172 n.2 (emphasis added). Appellants argue that, in the present case, they should likewise be granted access to the videotape of President Clinton's testimony because it has already been played at trial.

Finally, as to the district court's reasoning that it was treating President Clinton's testimony in a manner equivalent to live testimony provided at trial (because cameras are not permitted in the court room under Fed. R. Crim. P. 53), appellants argue that the district court's decision to keep the videotape under seal actually gives the President special treatment because he was the one who requested permission to testify on videotape. Thus, they argue, the district court's disposition violates their common law and First Amendment rights. We disagree.

## Common law right of public access to judicial records

Upon careful review, we hold that appellants' common law right of public access to judicial records was not violated as a consequence of the district court's denial of physical access to the videotape of President Clinton's testimony. To begin, we hold as a matter of law that the videotape itself is not a judicial record to which the common law right of public access attaches. Appellants are incorrect to assume that this issue turns on whether or not the videotape itself was admitted into evidence and that, therefore, the litigants at trial have control to decide whether or not the public's right may be exercised. See Brief for Appellants (Reporters) at 13 ("The defendants should not be permitted to circumvent the common law and constitutional rights to access by marking only the transcript of the videotaped deposition."). Even if the defendants had moved for the admission of the videotape into evidence, the videotape itself would not necessarily have become a judicial record subject to public review. See, e.g., Nixon v.

-11-

<u>Warner Communications, Inc.</u>, 435 U.S. at 591 (audiotapes, which were kept under seal, had been admitted into evidence at trial); <u>Webbe</u>, 791 F.2d at 104 (same).  We conclude, for reasons unrelated to the fact that the videotape was never admitted into evidence, that the videotape itself is not a judicial record for purposes of this analysis.

The district court in the present case declined to decide whether the videotape itself was a judicial record to which the common law right attaches, but did note that courts are divided over whether a videotape of witness testimony, taken pursuant to Fed. R. Crim. P. 15, is a judicial record.  Slip op. at 6-7 (comparing, for example, <u>Application of American Broadcasting Cos.</u>, 537 F. Supp. 1168, 1171-72 (D.D.C. 1982) (<u>Application of ABC</u>) (holding that a videotape of a Rule 15 deponent's testimony is not a judicial record for purposes of broadcasters' right of access because otherwise such deponents would be subject to "exceptional treatment" as compared with other witnesses), with <u>In re Application of CBS, Inc.</u>, 828 F.2d 958 (2d Cir. 1987) (holding that, absent extraordinary circumstances, the press has a common law right to inspect and copy the videotape of depositions used at trial where the witness is unable to provide live testimony; privacy interests of an ill witness were not sufficiently extraordinary to preclude press access)).

In <u>Nixon v. Warner Communications, Inc.</u> and <u>Webbe</u>, the audiotapes in dispute were recordings of the primary conduct of witnesses or parties.  Therefore, those recordings were similar to documentary evidence to which the common law right of public access ordinarily may apply.  By contrast, the videotape at issue in the present case is merely an electronic recording of witness testimony.  Although the public had a right to hear and observe the testimony at the time and in the manner it was delivered to the jury in the courtroom, we hold that there was, and is, no additional common law right to obtain, for purposes of copying, the

-12-

electronic recording of that testimony.  By comparison, Rule 53 of the Federal Rules of Criminal Procedure prohibits photography or other electronic recording of live witness testimony in the courtroom.  Our holding today comports with Rule 53 because it mandates that Rule 15 deponents are treated equally to witnesses who testify in court, in person.  Accord Application of ABC, 537 F. Supp. at 1171-72.  In other words, contrary to appellants' argument, our holding does not give special treatment to Rule 15 deponents vis-a-vis witnesses who present live in-court testimony but rather puts them on equal footing.[13]  Accordingly, we conclude that appellants have failed to assert a cognizable common law claim in the present case because the videotape itself is not a judicial record to which the common law right of public access attaches.

Even if we were to assume that the videotape is a judicial record subject to the common law right of public access, we would hold that the district court did not abuse its discretion in denying access in the present case.  The legal standards governing the common law right are well-established in this circuit.  This court stated in Webbe "the consideration of competing values is one heavily reliant on the observations and insights of the presiding judge."  791 F.2d at 106 (agreeing with the Fifth Circuit's standard in Belo Broadcasting Corp. v. Clark, 654 F.2d 423, 431-34 (5th Cir. 1981)).  Although we recognize that there is a common law presumption in favor of public access to judicial records, Nixon v. Warner Communications, Inc., 435 U.S. at 602, we note that this court in Webbe specifically rejected the *strong* presumption

---

[13]Nor can it be said that President Clinton has received special treatment because the district court permitted him to testify by videotaped deposition.  See United States v. Poindexter, 732 F. Supp. 142, 144-46, 159-60 (D.D.C. 1990) (surveying instances where presidents of the United States have been called upon to provide testimony and concluding that former President Reagan was not immune from being subpoenaed to testify for a criminal trial; however, consistent with a longstanding tradition of not requiring in-court presidential testimony, he could testify by videotaped deposition).

standard adopted by some circuits. 791 F.2d at 106 ("[w]e decline to adopt in toto the reasoning of the Second, Third, Seventh, and District of Columbia Circuits in recognizing a 'strong presumption' in favor of the common law right of access"); see also Webster Groves Sch. Dist. v. Pulitzer Publishing Co., 898 F.2d 1371, 1376 (8th Cir. 1990) ("[w]hen the common law right of access to judicial records is implicated we give deference to the trial court rather than taking the approach of some circuits and recognizing a 'strong presumption' favoring access"). Contrary to appellants' assertions, the "compelling government interest" test applied in In re Search Warrant (Gunn), 855 F.2d at 754, may not be interpreted as incorporating a *strong* presumption favoring public access for purposes of the common law right. In that case, we employed the compelling interest test in the context of determining whether the qualified First Amendment right of public access attached to specific documents which we had found to be judicial records. Id.[14]

Moreover, our deferential standard under the common law is in harmony with the Supreme Court's analysis in Nixon v. Warner Communications, Inc., 435 U.S. at 598, in which the Court stated that "[e]very court has supervisory power over its own records and files, and access has been denied where the court files might become a vehicle for improper purposes." The Supreme Court concluded, with respect to the common law right of public access, "the decision as to access is best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Id. at 599.

---

[14]Citizens' argument that we overruled United States v. Webbe, 791 F.2d 103 (8th Cir. 1986), in In re Search Warrant (Gunn), fails not only on the merits but also because a panel of this court lacks authority to overrule a prior panel decision. For this reason, we also could not now overrule Webbe, as Citizens urges.

-14-

We now turn to the district court's balancing of competing interests in the present case. As noted above, the district court concluded that, even assuming the videotape is a judicial record for purposes of the common law analysis, the circumstances favored keeping the videotape sealed because: (1) substantial access to the information provided by the videotape had already been afforded; (2) release of the videotape would be inconsistent with the ban on cameras in the courtroom under Fed. R. Crim. P. 53; (3) in other cases involving videotaped testimony of a sitting president, the tapes were not released; and (4) there exists a potential for misuse of the tape, a consideration specifically recognized in Nixon v. Warner Communications, 435 U.S. at 601 (noting President Nixon's argument that the audiotapes could be distorted through cutting, erasing, and splicing). Slip op. at 7-9. In addition to these sound reasons stated by the district court, we note the following compelling considerations which further support the conclusion that the district court did not abuse its discretion.

In Nixon v. Warner Communications, Inc., 435 U.S. at 602-03, the Supreme Court considered it a "crucial fact" that giving the press access to the audiotapes for purposes of making copies involved "a court's cooperation in furthering their commercial plans." The Supreme Court further explained that the courts have

> a responsibility to exercise an informed discretion as to release of the tapes, with a sensitive appreciation of the circumstances that led to their production. This responsibility does not permit copying upon demand. Otherwise, there would exist a danger that the court could become a partner in the use of the subpoenaed material "to gratify private spite or promote public scandal," with no corresponding assurance of public benefit.

Id. at 603 (quoting In re Caswell, 18 R.I. 835, 836 (1893)). We agree, as a matter of public policy, that courts should avoid

-15-

becoming the instrumentalities of commercial or other private pursuits.

We also note that granting access to the videotape of President Clinton's testimony could harm the strong public interest in preserving the availability of material testimony in criminal trials.  On the other hand, the public's interest in gaining access to the videotape recording is only marginal because the testimony has already been made visually and aurally accessible in the courtroom and the transcript has been widely distributed and publicized.

Finally, as a matter of historical interest and public policy, there has never been compelled in-court live testimony of a former or sitting president, nor has there ever been compelled dissemination of copies of a videotape recording of a sitting president's testimony.[15]  These facts, we think, suggest that there is a strong judicial tradition of proscribing public access to recordings of testimony given by a sitting president, which further supports our conclusion that the district court did not abuse its discretion in the present case.

---

[15]In United States v. Poindexter, 732 F. Supp. 170 (D.D.C. 1990), which was decided by the District Court for the District of Columbia, President Reagan was not the sitting president at the time he testified.  Moreover, no reasons were given by the district court to explain its comment, in dicta, that it intended to release the videotape after the tape had been used at trial.  Id. at 172 n.2.  We see no reasonable basis for reading into that decision the holding that the press had a common law right of access to the videotape of President Reagan's deposition.  Cf. Application of American Broadcasting Cos., 537 F. Supp. 1168, 1172 (D.D.C. 1982) (holding that common law right does not extend to videotape of Rule 15 deponent's testimony).

First Amendment right of access to public information

Upon <u>de novo</u> review, we also agree, as a matter of law, with the district court's holding that the First Amendment right of access to public information does not extend to the videotape of President Clinton's deposition testimony.  As the district court noted, members of the public, including the press, were given access to the information contained in the videotape.  Therefore, appellants received all the information to which they were entitled under the First Amendment.

In addressing the press's First Amendment right to public information as applied to the facts in <u>Nixon v. Warner Communications, Inc.</u>, the Supreme Court stated:

> There simply were no restrictions upon press access to, or publication of any information in the public domain.  Indeed, the press -- including reporters of the electronic media -- was permitted to listen to the tapes and report on what was heard.  Reporters were also given transcripts of the tapes, which they were free to comment upon and publish.  The contents of the tapes were given wide publicity by all elements of the media.  There is no question of a truncated flow of information to the public.  Thus, the issue presented in this case is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes -- to which the public has never had physical access -- must be made available for copying. . . .
>
> The First Amendment generally grants the press no right to information superior to that of the general public.  "Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom.  But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public."

435 U.S. at 609 (quoting Estes v. Texas, 381 U.S. 532, 589 (1965) (Harlan, J., concurring)).  In other words, in Nixon v. Warner Communications, Inc., the Supreme Court held that, where access to audiotapes was sought by the press on grounds that they were public information, the press's First Amendment right was adequately protected because members of the public, including the press, were (1) permitted to listen to the audiotapes as they were played to the jury in the courtroom and (2) furnished with copies of the written transcript.  Under these circumstances, the First Amendment right of public access did not extend to the audiotapes themselves.  Similarly, in the present case, the First Amendment right does not extend to the videotape in dispute.[16]

## Conclusion

For the foregoing reasons, we affirm the district court's denial of access to the videotape, as to both the Reporters and Citizens.  Because we dispose of this case on the merits of appellants' common law and First Amendment claims, we find it unnecessary to address the standing issue raised by Citizens.  The order of the district court is affirmed.  Judgment shall be entered accordingly.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[16]By contrast to the present case, we held in In re Search Warrant (Gunn) that "the first amendment right of public access does extend to the documents filed in support of search warrant applications."  855 F.2d at 573 (emphasis added).  We therefore proceeded to address the issue of whether nondisclosure was necessary to protect a compelling government interest, which is not a relevant issue in the present case.

-18-